# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

MERCEDES URBINA,

     Plaintiff,

v.

NATIONAL BUSINESS FACTORS, INC.
OF NEVADA,

     Defendant.

Case No.: 3:17-cv-00385-WGC

**Order**

Re: ECF No. 49

Before the court is Plaintiff Mercedes Urbina's Motion for Partial Summary Judgment. (ECF Nos. 49, 49-1, 49-2.) Defendant National Business Factors, Inc. of Nevada (NBF) filed a response. (ECF No. 50, errata at 54.) Urbina filed a reply. (ECF No. 51.)

For the reasons stated below, Urbina's motion for partial summary judgment is denied, and summary judgment is granted in NBF's favor under Federal Rule of Civil Procedure 56(f) because a preponderance of the evidence demonstrates that NBF's violation of the Fair Dept Collection Practices Act, 15 U.S.C. § 1692, et. seq., "was not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid any such error." 15 U.S.C. §1692k(c).

## I. BACKGROUND

Urbina is proceeding on her first amended complaint (FAC). (ECF No. 41.) Urbina alleges that she signed an agreement for medical services with Tahoe Fracture Clinic and received treatment from Tahoe Fracture Clinic periodically. Urbina and her insurance company made various payments for her medical treatment. Eventually, Tahoe Fracture Clinic sent Urbina a statement with a past due balance. Tahoe Fracture Clinic assigned the debt for collection to NBF,

and NBF sent Urbina a collection letter requesting payment of principal and interest. Urbina alleges NBF violated the FDCPA because it was not permitted to charge interest under NRS 99.040, and even if it was permitted to charge interest, NBF calculated interest from the wrong starting date and did not have procedures in place to avoid such an error. Urbina moves for partial summary judgment as to NBF's liability under the FDCPA.

NBF argues that it lawfully added interest to the account under NRS 99.040(1)(b) because the debt was a settled book account once all payments from the insurance company and Ubrina had been deducted. NBF admits that there was an error in calculating the amount of interest due, but argues that it should benefit from the bona fide error defense because Tahoe Fracture Clinic transmitted the wrong last date of payment to NBF when the account was assigned.

## II. LEGAL STANDARD

"The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the facts before the court." *Northwest Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994) (citation omitted). In considering a motion for summary judgment, all reasonable inferences are drawn in favor of the non-moving party. *In re Slatkin*, 525 F.3d 805, 810 (9th Cir. 2008) (citation omitted). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). On the other hand, where reasonable minds could differ on the material facts at issue, summary judgment is not appropriate. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

///

///

///

## III. DISCUSSION

**A. Material Facts**

The material facts are not in dispute:

Urbina signed agreements for medical services with Tahoe Fracture Clinic on December 17, 2013, and August 24, 2015, where she agreed she was "financially responsible for all charges whether or not paid by [ ] insurance." (ECF No. 49-1 at 7, 9.) The agreements said "all charges," but did not specifically mention interest.

Urbina received treatment from Tahoe Fracture Clinic periodically between August 24, 2015 and June 14, 2016. (ECF No. 49-1 at 11-19.) Tahoe Fracture Clinic sent her a statement dated September 23, 2016, showing that after insurance adjustments and payments, as well as Urbina's payments of $30 on February 26, 2016, March 31, 2016, April 29, 2016, and August 12, 2016, Urbina's had a past due balance of $614.52. (*Id.*)

On December 16, 2016, Tahoe Fracture Clinic sent Urbina a "final notice" indicating a balance owed of $614.52. (ECF No. 49-1 at 22; ECF No. 50 at 13.) This notice advised Urbina that she had not paid the balance due on her account and did not respond to notices. She was cautioned that if payment in full was not made within 10 days, Tahoe Fracture Clinic may turn her account over to legal collections. (*Id.*)

Tahoe Fracture Clinic and NBF entered into a collection service agreement where Tahoe Fracture Clinic agreed to exclusively assign NBF its delinquent accounts for collection in exchange for a fee of the collected amount. (ECF No. 50 at 11.) The agreement contemplates that NBF could charge interest on the principal debt, at the rate provided by law. (*Id.*) The agreement states that Tahoe Fracture Clinic agreed to assign accounts to NBF "with only accurate data and that the balances reflect legitimate, enforceable obligations of the consumer." (*Id.*)

Tahoe Fracture Clinic assigned Urbina's debt to NBF for collection on January 4, 2017.

NBF obtains its collections files from Tahoe Fracture Clinic in a folder with many accounts that is sent to NBF in an encrypted email. The email goes to NBF's software and data is loaded into an information sheet that includes the date the account was assigned, the date of the last charge, the last pay, and last activity. NBF relies on its clients to provide the information, including the date of the last payment. The system then generates an initial collection notice.

Tahoe Fracture Clinic did not (and as a practice does not) add interest to the account, and leaves it to NBF to decide whether and how much interest is charged. NBF does not charge interest if a client affirmatively asks that interest not be charged. Tahoe Fracture Clinic does not prohibit NBF from charging interest.

NBF sent Urbina a collection notice on January 5, 2017, seeking to collect $614.52 in principal, and $29.07 in interest. (ECF No. 49-1 at 24; ECF No. 50 at 15.)

NBF admits that the interest was calculated from February 26, 2016, through January 5, 2017. NBF contends that it received an incorrect date of last payment of February 26, 2016, from Tahoe Fracture Clinic when it assigned the debt to NBF for collection. Urbina actually made her last payment on August 12, 2016.

**B. Legal Issues**

The preliminary legal issue presented is whether NBF lawfully added interest to Urbina's account. If NBF was lawfully allowed to add interest, NBF admits that it calculated interest from the wrong date (February 26, 2016, instead of August 12, 2016). Therefore, the court must then consider whether the error was material so as to be actionable under the FDCPA, and if it is, whether NBF can take advantage of the bona fide error defense under 15 U.S.C. § 1692k(c).

///

### 1. The FDCPA

The FDCPA aims to protect consumers from abusive, unfair, and deceptive debt collection practices. *See* 15 U.S.C. § 1692; *Gonzales v. Arrow Financial Services, LLC*, 660 F.3d 1055, 1060 (9th Cir. 2011). Congress has authorized private individuals to bring suit for violations of the FDCPA. 15 U.S.C. § 1692k. To succeed on a claim made under the FDCPA, the plaintiff must establish: (1) he or she is a consumer; (2) the defendant is a debt collector; and (3) the defendant committed some act or omission in violation of the FDCPA. *See* 15 U.S.C. § 1692a(3)-(6). A prevailing plaintiff is entitled to actual damages, statutory damages and attorney's fees and costs. 15 U.S.C. § 1692k(a). Conversely, if the court finds the action was brought in bad faith or to harass, it may award the defendant its attorney's fees and costs. 15 U.S.C. § 1692k(a)(3).

Here, there is no dispute that Urbina is a consumer, and that NBF is a debt collector; therefore, the issue is whether there has been a violation of the FDCPA.

Section 1692e of the FDCPA prohibits the use of "any false, deceptive, or misleading representation or means in connection with the collection of any debt," and includes a non-exhaustive list of proscribed conduct. As is relevant here, section 1692e prohibits a debt collector from: falsely representing the character, amount or legal status of a debt (§1692e(2)(A)); threatening to take action that cannot legally be taken (§ 1692e(5)); and, using false or deceptive means to collect or attempt to collect a debt (§ 1692e(10)).

Section 1692f of the FDCPA precludes a debt collector from engaging in unfair or unconscionable conduct to collect a debt, and also includes a non-exhaustive list of proscribed conduct. For purposes of this case, section 1692(f) precludes a debt collector from collecting interest "unless such amount is expressly authorized by the agreement creating the debt *or* [is] permitted by law." 15 U.S.C. § 1592(f)(1) (emphasis added).

The Ninth Circuit has adopted the least sophisticated consumer standard in evaluating these violations. *See e.g. Afewerki v. Anaya Law Grp.*, 868 F.3d 771, 775 (9th Cir. 2017); *Tourgeman v. Collins Fin. Servs.,* 755 F.3d 1109, 1119 (9th Cir. 2014) (citation omitted). This is an objective standard, and a violation of the FDCPA is determined by the court as a matter of law. *See Afewerki*, 868 F.3d at 775; *Tourgeman*, 755 F.3d at 1118 (citation omitted). The standard asks "whether the hypothetical least sophisticated debtor would likely have been misled." *Afewerki,* 868 F.3d at 775.

**2. Was NBF's Attempt to Collect Interest on the Debt Lawful?**

As was stated above, a debt collector may collect interest charges on a debt if interest charges are "expressly authorized by the agreement creating the debt" *or* interest charges are "permitted by law." 15 U.S.C. § 1692(f)(1). A false representation regarding the amount of a debt violates 15 U.S.C. § 1692e(2). If the debt collector was not lawfully permitted to collect or attempt to collect interest on a debt, the debt collector would also violate 15 U.S.C. § 1692e(5). Finally, an interest charges which violates section 1692f of the FDCPA also necessarily violates section 1692e(10), which prohibits the use of false representations or deceptive means to collect a debt. *See e.g. Valentin v. Grant Mercantile Agency, Inc.*, Case No. 1:17-cv-01019-AWI-SKO, 2017 WL 6604410, at *6 (E.D. Cal., Dec. 27, 2017) (citing *Newman v. Checkrite Cal., Inc.*, 912 F.Supp. 1354, 1367 (E.D. Cal. 1995), *superseded by statute on other grounds*).

NBF argues that its contract with Tahoe Fracture Clinic authorized it to collect interest on accounts assigned by Tahoe Fracture Clinic to NBF; however, the language of section 1692(f)(1) focuses on "the agreement creating the debt" and not the agreement between the creditor and the debt collector.

The agreements Urbina signed with Tahoe Fracture Clinic did not expressly authorize the collection of interest, but instead generally refer to Urbina being responsible for "all charges." The

court finds that such broad language cannot be construed as evidence of an intent to agree to allow interest to be charged on a debt. As a result, the court must determine whether Nevada law authorized NBF to collect interest on the debt.

### a. NRS 99.040

#### i. The Statute

Nevada law allows the recovery of interest on debts under certain circumstances. NRS 99.040 provides:

> 1. When there is no express contract in writing fixing a different rate of interest, interest must be allowed at a rate equal to the prime rate at the largest bank in Nevada, as ascertained by the Commissioner of Financial Institutions, on January 1 or July 1, as the case may be, immediately preceding the date of the transaction, plus 2 percent, upon all money from the time it becomes due, in the following cases:
>
> (a) Upon contracts, express or implied, other than book accounts;
>
> (b) Upon the settlement of book or store accounts from the day on which the balance is ascertained.
>
> (c) Upon money received to the use and benefit of another and detained without his or her consent.
>
> (d) Upon wages or salary, if it is unpaid when due, after demand therefor has been made.
>
> The rate must be adjusted accordingly on each January 1 and July 1 thereafter until the judgment is satisfied.
>
> 2. The provisions of this section do not apply to money owed pursuant to chapter 624 of NRS which is governed by the provisions of NRS 624.630.

NRS 99.040 (1).

A "book account" is defined in the statute as:

> [A] detailed statement which:

(a) Constitutes the principal record of one or more transactions between a debtor and a creditor arising out of a contract or some fiduciary relationship;

(b) Shows the debits and credits in connection with that contract or fiduciary relationship and shows against whom and in favor of whom the entries are made;

(c) Is entered in the regular course of business as conducted by such creditor or fiduciary; and

(d) Is kept in a reasonably permanent form and manner:

(1) In a bound book;

(2) On a sheet or sheets fastened in a book or to backing but detachable therefrom;

(3) On a card or cards of a permanent character; or

(4) In any other reasonably permanent form and manner.

NRS 99.040(3).

### ii. Was Urbina's Account a Book Account?

The parties agree that Urbina's account with Tahoe Fracture Clinic was a book account as it is defined in NRS 99.040(3). The evidence before the court includes a detailed statement (the September 23, 2016 statement at ECF No. 49-1 at 11-20) representing several transactions between Urbina and Tahoe Fracture Clinic arising out of the agreements for medical services, and shows debits and credits in connection with that agreement. The statement shows against whom and in favor of whom the entries are made (i.e., payments made by Urbina credited to the account, insurance write-offs or adjustments, and insurance payments). The statement appears to have been entered in the regular course of Tahoe Fracture Clinic's business, and to have been kept in a reasonably permanent form and manner. Therefore, the court agrees that Urbina's account with Tahoe Fracture Clinic was a book account.

Under the statute then, interest is allowed "upon the settlement of [the] book account" "from the day on which the balance is ascertained." NRS 99.040(1)(b).

### iii. How is a book account settled?

The court must now determine how a book account becomes settled.

NRS 99.040 does not define what it means for a book account to be "settled." "When interpreting state law, we are bound to follow the decisions of the state's highest court, and when the state supreme court has not spoken on an issue, we must determine what result the court would reach based on state appellate court opinions, statutes and treatises." *Diaz v. Kubler Corp.*, 785 F.3d 1326, 1329 (9th Cir. 2015) (citation and quotation marks omitted).

A "book account," at least in the context of NRS 99.040, appears to be the equivalent of an "open account" while it is not closed or settled. *Checker, Inc. v. Zeman*, 467 P.2d 100, 102, 86 Nev. 216, 219 (1970).

Early Nevada Supreme Court opinions indicated that interest may be charged with respect to a book account if the balance owed is settled, but not when an account remains open or unsettled. Those opinions equate a debt as being settled when the balance is "liquidated." *See Flannery v. Anderson*, 4 Nev. 437 (1868) (trial court improperly allowed award of interest under 1861 version of statute which allowed interest "for money due on the settlement of accounts from the day on which the balance is ascertained." The account was "open and unsettled" so interest was not recoverable.); *Skinker v. Clute*, 9 Nev. 342 (1874) (confirmed interest allowed on the settlement of an open account from the day on which the balance was ascertained; held interest was allowed because the account was liquidated and the balance was ascertained by admission in the answer); *Hobart Estate Co. v. Jones*, 274 P. 921, 51 Nev. 315 (1929) (to award prejudgment interest there must be a showing the claim was liquidated); *Agricultural Ins. Co. of Watertown, N.Y. v. Biltz*, 64

P.2d 1042, 1047, 57 Nev. 370 (1937) (prejudgment interest was not allowed when the claim was unliquidated until rendition of the judgment); *Dollar Investment Corporation v. Modern Market, Inc.*, 365 P.2d 311, 77 Nev. 393, 396 (1961) (prejudgment interest was allowed where contract allowed the parties to determine the exact amount due prior to judgment); *Arley v. Liberty Mutual Fire Insurance Company,* 388 P.2d 576, 581, 80 Nev. 5, 14 (1964) (interest could not run until the entry of judgment where the loss on the building was "not liquidated" until the judgment was rendered); *Sierra Pacific Power Co. v. Nye,* 389 P.2d 387, 391, 80 Nev. 88, 96 (1964) (prejudgment interest allowed in suit against power company for overpayment where the amount of overpayment was ascertainable by mathematical calculation prior to entry of judgment); *Dudrey v. Milner*, 396 P.2d 30, 80 Nev. 447, 451 (1964) (disallowed prejudgment interest where partnership agreement said that price of deceased partner's share could only be determined by an audit and until the audit occurred the value was unknown).

In 1968, the Nevada Supreme Court confronted whether the trial court properly limited the recovery of interest to the time of judgment in a contract action *not involving a book account. Paradise Homes, Inc. v. Central Surety and Ins. Corp.*, 437 P.2d 78, 84 Nev. 109 (1968). The Nevada Supreme Court described the issue of "interest incident to civil litigation" as "a vexatious question not only in Nevada, but everywhere." *Paradise*, 437 P.2d at 80. After surveying most of the cases discussed above, the Nevada Supreme Court noted that it had "attached great significance to the question of liquidated versus unliquidated damages in deciding whether interest would be allowed prior to or at judgment." *Id*. at 82. The court admitted that to that point it had not defined when damages were liquidated or unliquidated in order to support an award of prejudgment interest. *Id*. at 83.

///

1    In continuing with its analysis, the court was careful to point out that it was only dealing

2    with that portion of NRS 99.040 pertaining to express or implied contracts *other than book*

3    *accounts*. *Id.* The court then set out the requirements for obtaining interest in a case involving an

4    express or implied contract *other than a book account* (i.e., under NRS 99.040(1)(a)). For that

5    portion of NRS 99.040, interest is allowed "upon all money from the time it becomes due." The

6    Nevada Supreme Court construed this as meaning "when performance was due as resolved by the

7    court upon trial of the cause." *Id*.

8          The court went on to state that the amount of money to which the interest rate will be

9    applied (in the case of a non-book account contract) is the sum of money provided for in the

10   contract. *Id*. If the contract does not provide a specified sum, then it is the value of the performance

11   called for by the contract, which is either the value stated for performance in the contract, or

12   calculated from a standard supplied by the contract or by established market prices. *Id*. The court

13   concluded that "[p]re-judgment interest shall be allowed on the amount of the debt or money value

14   so determined, after making all the deductions to which the defendant may be entitled." *Id*. In

15   *Paradise*, the court concluded that prejudgment interest should have been allowed because the

16   contract stated the value of the performance in the contract or it was ascertainably by calculating

17   from a standard in the contract or market prices. *Id*. at 83-84.

18         A reading of *Paradise* leads to the conclusion that the Nevada Supreme Court abandoned

19   the liquidated versus unliquidated test for imposing prejudgment interest with respect to express

20   or implied contracts *other than book accounts*. The liquidated versus unliquidated standard still

21   appears to apply to book accounts under NRS 99.040(1)(b). This makes sense because

22   NRS 99.040(1)(b) states that interest is allowed upon the settlement of a book account from the

23   day on which the balance is ascertained. This is in contrast to NRS 99.040(1)(a), which merely

states that interest can be added on all money from the time it becomes due. When a book account is settled and the balance is ascertained, there is no need to wait for a judgment to determine the amount on which interest may be charged.

This interpretation of *Paradise* is supported by a 1998 opinion by the Nevada Attorney General. This opinion recognized that whether a book account is settled depends on whether the debt is liquidated, and if an account is settled prejudgment interest maybe allowed. 1998 Nev. Op. Atty. Gen. 141, at *6, 8 (1998). That opinion considered an account to be "settled or liquidated only if the account has been closed in the sense that the creditor is permitting no additional charges and/or otherwise not subject to dispute as to amount." *Id*. at * 8. If an account remains open (is not settled or liquidated), then the opinion suggests (consistent with *Paradise*) that interest may only be imposed after judgment has been entered.

Incidentally, Black's Law Dictionary defines an "open account" as "[a]n unpaid or unsettled account[;]" and an account "that is left open for ongoing debit and credit entries by two parties and that has a fluctuating balance until either party finds it convenient to settle and close, at which time there is a single liability. " Black's Law Dictionary (10th ed. 2014).

In sum, as is provided by the plain language of NRS 99.040(1)(b), interest is allowed upon the settlement of a book account from the day on which the balance is ascertained. A book account becomes settled when the debt is liquidated, which occurs when the creditor permits no additional charges and the debt is not otherwise subject to dispute as to amount and a single liability remains.

### iv. Was the book account settled?

The questions now confronting the court are: (1) was the book account between Urbina and Tahoe Fracture Clinic settled; and if so, (2) when was the balance ascertained (if at all)? Three key dates come into play in making these determinations: (a) August 12, 2016, when Urbina made

her last payment; (b) August 23, 2016, when Tahoe Fracture Clinic sent Urbina the detailed statement with the $614.52 balance; and, (c) December 16, 2016, when it sent her the "final notice" noting the $614.52 past due balance, and advising her that if she failed to pay her account may be turned over to legal collections.

Urbina argues that she was never able to settle her book account with Tahoe Fracture Clinic because she had many other bills and had to file for bankruptcy protection due to her debts.

NBF argues that the book account was settled and interest may be charged on a book account under NRS 99.040(1)(b) from the day on which the balance is ascertained.

It is undisputed that: Urbina treated with Tahoe Fracture Clinic until June of 2016; the last insurance adjustments and payments were made in July of 2016; Urbina made her last payment on August 12, 2016; "[a]fter Ms. Urbina was treated, she owed a balance of $614.52"[1]; Tahoe Fracture Clinic sent Urbina a statement on September 23, 2016, detailing the charges, insurance adjustments, insurance payments, Urbina's payments and the unpaid balance; Urbina was unable to pay the balance; on December 16, 2016, Tahoe Fracture Clinic sent Urbina a "final notice" noting she had not paid the $614.52 balance due on her account and if payment was not made within 10 days her account may be turned over to legal collections; NBF sent Urbina a collection notice on January 5, 2017, seeking to collect $614.52 in principal and $29.07 in interest; and, NBF calculated interest from the February 26, 2016 last payment date given to it by Tahoe Fracture Clinic.

From this evidence, the court concludes that the account was settled either when Tahoe Fracture Clinic sent the September 23, 2016 statement, or when it sent the December 16, 2016 "final notice." At the time the September 23, 2016 statement was sent, Urbina had stopped treating

---

[1] ECF No. 49 at 2:6-7.

with Tahoe Fracture Clinic and acknowledges the amount that was owed. At that point, it appears clear that Tahoe Fracture Clinic was closing the account and Urbina admits she received the notice; did not dispute the amount past due; and, could not pay the bill. Tahoe Fracture Clinic had subtracted all payments made by Urbina and her insurance company and all insurance adjustments so that there was a single liability remaining. Even if there is some dispute as to whether Tahoe Fracture Clinic was closing the account at that time, it was abundantly clear when the "final notice" was sent on December 16, 2016, that the account was closed and settled. Urbina was advised of the balance owing for a second time, and was told that if she did not remit the balance due her account may be referred to legal collections.

It is not important whether the account was settled on September 23, 2016, or December 16, 2016, because it was settled prior to the time it was assigned to NBF for collection. Therefore, NBF was permitted to charge interest under NRS 99.040(1)(b) (interest must be allowed at the statutory rate *upon the settlement* of the book account).

### v. When Was the Balance Ascertained (if at all)?

Having determined that NBF was legally permitted to collect interest on the debt, NBF was allowed to charge interest under NRS 99.040(1)(b) "from the day on which the balance is ascertained." The court must now address when the balance was ascertained, if at all.

Urbina appears to argue the balance could not be ascertained because her contracts with Tahoe Fracture Clinic did not state a definite sum that would be owed after treatment, and only a court can fix the date on which interest begins to accrue. She relies on *Paradise* to argue that under these circumstances, NBF could not charge prejudgment interest. The court has already addressed Urbina's misapplication of *Paradise* in this regard.

NBF contends the balance on Urbina's account was ascertained after all payments by insurance and/or Urbina had been deducted. NBF also states that it charged interest from February 26, 2016, the date Tahoe Fracture Clinic reported to NBF as the date of last payment instead of August 12, 2016, which was the actual date of last payment.

Again, Urbina's last treatment with Tahoe Fracture Clinic was on June 14, 2016. The last insurance adjustments and insurance payments on her account were made on July 21, 2016. Urbina made her last $30 payment on August 12, 2016, approximately two months after her last service. There were no other payments made toward the account, and no other charges. Therefore, the balance was ascertained on August 12, 2016.

Urbina argues that NBF does not give a basis for adding interest from a date prior to the time it received the account, but the authority for this is NRS 99.040(1)(b), which allows interest "from the day on which the balance is ascertained." The September 23, 2016 statement reflects the balance that was ascertained, but there are no other charges, payments or adjustments made after August 12, 2016, when Urbina made her last payment. This supports the conclusion that the balance was ascertained on August 12, 2016.

In fact, Urbina's amended complaint admits that if NBF was allowed to assess interest under NRS 99.040, it should have calculated interest from August 12, 2016, and not February 26, 2016. (ECF No. 41 at 3 ¶ 15.) Her motion also confirms that after she was treated by Tahoe Fracture Clinic "she owed a balance of $614.52." (ECF No. 49 at 2:6-7.) The final balance was ascertained when she made her last payment on August 12, 2016, which is the last monetary transaction in the book account between Urbina and Tahoe Fracture Clinic.

Urbina emphasizes that Tahoe Fracture Clinic gave her until January 6, 2017 to pay her bill, arguing that as a result the balance could not have been ascertained. This ignores the fact that

Tahoe Fracture Clinic was allowing her additional time to pay a past due bill before it was sent to legal collections. The amount owed by Urbina to Tahoe Fracture Clinic had not changed since she made her August 12, 2016 payment; therefore, the balance was ascertained at that time.

### vi. NBF Charged Urbina Interest from the Wrong Date

While NBF was legally permitted to charge interest on the debt under NRS 99.040(1)(b) from August 12, 2016, NBF admits that it calculated interest from the wrong date. It calculated interest from February 26, 2016, which is the date of the last payment given to it by Tahoe Fracture Clinic, when the last payment was actually made on August 12, 2016.

In charging Urbina interest from a date prior to the date on which the balance was ascertained (from February 26, 2016, instead of August 12, 2016), NBF violated NRS 99.040(1)(b). In doing so, NFB also violated the FDCPA: a false representation regarding the amount of a debt violates 15 U.S.C. § 1692e(2); charging more interest than is legally authorized also appears to violate 15 U.S.C. § 1692e(5) (precluding a threat to take action that cannot legally be taken), and 15 U.S.C. § 1692e(10) (prohibiting the use of a false representation or deceptive means to attempt to collect a debt); and, attempting to collect interest unauthorized by agreement or law violates 15 U.S.C. § 1692f(1).

The court will address *infra* whether the error in calculating interest was material, and whether NBF may take advantage of the bona fide error defense.

### b. NRS 649.375

Urbina also argues that NBF violated NRS 649.375 because Tahoe Fracture Clinic did not impose interest prior to assigning the debt to NFB, and because the agreement between Tahoe Fracture Clinic and Urbina did not contain an agreement for the payment of interest.

NRS 649.375(2) governs the collection of interest by a collection agency. It provides that a collection agency may not:

> Collect or attempt to collect any interest, charge, fee or expense incidental to the principal obligation unless:
>
> > (a) Any such interest, charge, fee or expense as authorized by law or as agreed to by the parties has been added to the principal of the debt by the creditor before receipt of the item of collection;
> >
> > (b) Any such interest, charge, fee or expense as authorized by law or as agreed to by the parties has been added to the principal of the debt by the collection agency and described as such in the first written communication with the debtor; or
> >
> > (c) The interest, charge, fee or expense has been judicially determined as proper and legally due from and chargeable against the debtor.

Here, Tahoe Fracture Clinic did not add interest to the principal before assigning the debt to NBF for collection under NRS 649.375(2)(a). Nor has the interest been judicially determined under NRS 649.375(2)(c). The subsections of NRS 649.375(2) are written in the disjunctive; therefore, Tahoe Fracture Clinic did not need to add interest to the principal before assigning the debt to NBF, and NBF was not required to have a judicial determination of interest before proceeding to collect interest so long as it met the requirements of subsection (b).

Insofar as NRS 649.375(2)(b) is concerned, the court has found interest was authorized under NRS 99.040(1)(b).

The remaining issue then is whether the interest was added "and described as such in the first written communication with the debtor." Urbina argues that NBF was required to explain how interest was calculated to comply with the statute.

NBF's first communication with Urbina states that the account was assigned to NBF for collection and it sought to collect $614.52 in principal and $29.07 in interest. (ECF No. 49-1 at

17

24; ECF No. 50 at 15.) The court interprets the plain language of NRS 649.375(2)(b) to mean the collection agency has to describe the amount of principal as principal and the amount of interest as interest. The statute does not state that the collection agency is required to include an explanation of how the interest was calculated or under what authority. If the legislature intended to require such action of collection agencies, it could have done so. Giving an explanation for how interest was calculated and the authority utilized may avoid some confusion for debtors in the debt collection processes and serve as a mechanism for debt collectors to verify that interest is properly assessed, but this is not required under the statute. Therefore, NBF sufficiently complied with the requirement of the statute.

Next, as she did in connection with her motion for leave to amend, Urbina also argues that NBR violated NRS 649.375 because of the Ninth Circuit's holding in *Cruz v. International Collection Corp.*, 673 F.3d 991 (9th Cir. 2012).

The court finds, as it did previously, that *Cruz* is inapposite. Cruz wrote checks to Harrah's that bounced, and Harrah's subsequently assigned the claim to a collection agency, ICC. ICC sent multiple demand letters for payment indicating Cruz was responsible for paying the principal balance, accrued interest, statutory fees for returned checks and treble damages. The Ninth Circuit concluded under Nevada law that the debt collector could not collect interest or fees unless the interest or fees were added to the principal before the debt collector received the item of collection, citing NRS 649.375(2)(a). The court found no evidence Harrah's had added the interest or fees prior to assigning the debt to ICC. Therefore, it found the action to be false and misleading in violation of the FDCPA.

///

///

For whatever reason, *Cruz* contains no discussion of the applicability of NRS 649.375(b)(2), which plainly applies here. As a result, the court will not construe *Cruz's* holding as applying in this case.

In sum, the court finds that NBF properly attempted to collect interest under NRS 649.375(2)(b).

**3. Was NBF's Error in Calculating the Amount of Interest Material?**

NBF argues that the error in interest calculation (which it calculates as an extra $16.16 in interest between February 26, 2016, and August 12, 2016) was immaterial.

Urbina argues that whether or not the debt can bear interest is material.

The Ninth Circuit has imposed a materiality element for claims made under sections 1692e and 1692f. *See Afewerki v. Anaya Law Group*, 868 F.3d 771, 776 (9th Cir. 2017); *Davis v. Hollins Law,* 832 F.3d 962, 967 (9th Cir. 2016); *Donohue v. Quick Collect, Inc.*, 592 F.3d 1027 (9th Cir. 2010); *Tourgeman v. Collins Fin. Servs, Inc.*, 755 F.3d 1109, 1119 (9th Cir. 2014).

The materiality requirements is "a fairly narrow exception to the general rule requiring accuracy in communications from debt collectors." *Afewerki*, 868 F.3d at 776. "Material false representations, then, are those that could cause the least sophisticated debtor to suffer a disadvantage in charting a course of action in response to the collection effort." *Afewerki*, 868 F.3d at 776 (citation and quotation marks omitted). On the other hand, "[i]mmaterial false representations, by contrast, are those that are 'literally false, but meaningful only to the 'hypertechnical' reader." *Id*.

In *Afewerki*, the Ninth Circuit concluded that the overstatement of the principal due by $3,000, and the overstatement of the applicable interest rate were material. *Id*. at 777. The court contrasted this with *Donohue*, where the complaint against Donohue sought $270.99 in principal

with interest at a rate of 12 % per annum in the amount of $32.89. *Donohue*, 592 F.3d at 1029. It turned out that the $32.89 amount was actually comprised of $24.07 in pre-assignment finance charges and $8.82 in post-assignment interest. *Id*. at 1031. The court found the error was not material because "false but non-material representations are not likely to mislead the least sophisticated consumer[.]" *Id*. at 1033. This is because "[i]mmaterial statements, by definition, do not affect a consumer's ability to make intelligent decisions." *Id*. (citation omitted). Since the total amount of interest and charges was accurately stated but mischaracterized, it was not materially false and Donohue's choices remained the same: to contest the debt, or pay the stated amount and settle the debt. *Id*. at 1034.

In *Afewerki*, on the other hand, "the least sophisticated debtor in Afewerki's position would not have had the option to avoid the lawsuit by simply 'pa[ying] the accurately stated sum to settle [the] debt.'" *Afewerki*, 868 F.3d at 777 (quoting *Donohue*, 582 F.3d at 1034). "[T]he least sophisticated debtor in Afewerki's position, … may well have simply paid the amount demanded in the complaint and would have overpaid by approximately $3,000." *Id*. In addition, there was a state court case proceeding on the debt, which "could have proceeded to default judgment[,]" resulting in the entry of a "judgment [against him] for an inflated amount[.]" *Id*.

Under *Afewerki* and *Donohue*, NBF's error in calculating interest must be deemed material. In both cases, the Ninth Circuit's focus was not on the amount by which the debt was overstated, but whether was misleading to the debtor such that it would affect a consumer's ability to make intelligent decisions. In fact, "[a]n FDCPA plaintiff need not even have actually been misled or deceived by the debt collector's representation; instead, liability depends on whether the *hypothetical* 'least sophisticated debtor' likely would be misled." *Tourgeman*, 775 F.3d at 1117-

18. "[A] consumer possesses a right of action even where the defendant's conduct has not caused him or her to suffer *any pecuniary* or emotional harm." *Id.* (emphasis added).

Here, while the amount of interest overcharged between February 26, 2016, and August 12, 2016, may be minimal, the overstatement would be misleading to the least sophisticated consumer. The overall amount Urbina owed was not the same regardless of the error, as was the case in *Donohue*. Instead, like *Afewerki*, the least sophisticated debtor in Urbina's position could have simply overpaid the inflated interest charge. Therefore, the error in calculating interest was material.

### 4. The "Bona Fide Error" Defense?

The FDCPA is a strict liability statute "that makes debt collectors liable for violations that are not knowing or intentional." *Donohue*, 592 F.3d at 1030 (citation and quotation marks omitted). A debt collector sued under the FDCPA may, however, assert as an affirmative defense that the alleged violation was "not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid any such error." 15 U.S.C. § 1692k(c); *Afewerki*, 868 F.3d at 777, n. 3 ("Although '[t]he FDCPA is a strict liability statute' …, the statue provides for a bona fide error defense, 15 U.S.C. § 1692k(c).") (citation omitted).

The debt collector has the burden of proving the bona fide error affirmative defense by a preponderance of the evidence. 15 U.S.C. § 1692k(c); *McCollough v. Johnson, Rodenburg & Lauinger, LLC*, 637 F.3d 939, 948 (9th Cir. 2011) (citation omitted). "[T]o qualify for the bona fide error defense, the defendant must prove that (1) it violated the FDCPA unintentionally; (2) the violation resulted from a bona fide error; and (3) it maintained procedures reasonably adapted to avoid the violation." *McCollough*, 637 F.3d at 948.

*///*

21

Urbina contends the bona fide error defense is not available to NBF. She argues that the deposition testimony of Mary Hobbs (of NBF) confirms NBF did not have procedures in place ensure interest is calculated from the proper date. Urbina points to Hobbs' testimony that the account information comes to NBF through an encrypted email, and NBF takes no steps to assure accuracy of the email by requesting final billings of documents from the client. Urbina suggests that NBF should have had a policy to request the last statement for each account referral or some other type of "human intervention" because relying on the client for accurate information is legally insufficient.

Urbina cites to an exhibit 4, which she represents is a communication log from Tahoe Fracture Clinic, stating that Mary from NBF called and she was advised the last payment made was in August of 2016 for $30. (ECF No. 49 at 19:14-16.) Exhibit 4 to Urbina's motion (ECF No. 49-1 at 22) is the December 16, 2016 "final notice" from Tahoe Fracture Clinic. Her motion does not include any communication log from Tahoe Fracture Clinic; therefore, there is no evidence before the court of Hobb's, or anyone else at NBF, having knowledge of the actual date of last payment prior to this litigation commencing.

NBF states that the error in the calculation of interest occurred when Tahoe Fracture Clinic electronically transmitted Urbina's delinquent account information to NBF with the last payment date of February 26, 2016, and NBF had no way of knowing the last payment date was actually August 12, 2016. NBF was informed of the discrepancy during this litigation when Urbina's counsel produced Tahoe Fracture Clinic's billing records which gave a last payment date of August 12, 2016. NBF states that it relied on the February 26, 2016 date from Tahoe Fracture Clinic, and HIPPA precludes a medical provider from providing protected healthcare information which includes payment for the provision of health care. (Hobbs Decl., ECF No. 50 at 19-21.)

NBF contends that no collection agency has the manpower to review every account for complete accuracy of all information transmitted.

NBF states that the defense is applicable because it maintained a procedure reasonably adapted to avoid such error, citing to exhibit 6 which is an exemplar of a computer-generated letter it sends to its clients that asks the client to notify NBF if it recognizes any error in the accounts assigned for collection. NFB represents that this letter was sent to Tahoe Fracture Clinic and there was no reply. (Hobbs Decl., ECF No. 50 at 20 ¶ 4.) On this basis, NBF asks that the court enter summary judgment in its favor under Federal Rule of Civil Procedure 56(f).

Federal Rule of Civil Procedure 56(f) allows the court to grant summary judgment in favor of a non-moving party who has not sought summary judgment and to grant summary judgment on its own after there has been notice and a reasonable time to respond. Fed. R. Civ. P. 56(f)(1), (3); *Albino v. Baca*, 747 F.3d 1162, 1176 (9th Cir. 2014) (citations omitted) ("We have long recognized that, where the party moving for summary judgment has had a full and fair opportunity to prove its case, but has not succeeded in doing so, a court may enter summary judgment *sua sponte* for the nonmoving party."). "Even when there has been no cross-motion for summary judgment, a district court may enter summary judgment sua sponte against a moving party if the losing party has had a full and fair opportunity to ventilate the issues involved in the matter." *Gospel Missions of Am. v. City of Los Angeles*, 328 F.3d 548, 553 (9th Cir. 2003) (citation and quotation marks omitted).

Here, the parties have had a full and fair opportunity to "ventilate" the issues concerning the bona fide error defense. Urbina raised the issue initially in her own motion for summary judgment, had the benefit of reviewing NBF's response, and then filing a reply brief. If a preponderance of the evidence supports the availability of the defense to NBF, then the court may

grant summary judgment on NBF's behalf even though it did not file a cross-motion for summary judgment.

The court finds that NBF has submitted evidence to prove that it violated the FDCPA unintentionally, and that the violation resulted from a bona fide error: that its client provided it with the date of February 26, 2016, when she made her last payment on August 12, 2016 and that it did not become aware of this information until this litigation was initiated. Urbina does not argue NBF does not meet the first two requirements of the bona fide error defense. The court will now turn its focus to whether NBF maintained procedures reasonably adapted to avoid the violation.

"[T]he procedures that support a valid bona fide error defense must be reasonably adapted to avoid the specific error at issue." *McCollough*, 637 F.3d at 948 (citations and quotation marks omitted). The specific error at issue here is obtaining the correct last date of payment.

The Ninth Circuit has held that "if a debt collector *reasonably* relies on the debt reported by the creditor, the debt collector will not be liable for any errors." *Clark v. Capital Credit & Collection Services, Inc.*, 460 F.3d 1162, 1177 (9th Cir. 2006) (emphasis added).

While reliance on the creditor's representation of a debt may allow a debt collector to take advantage of the bona fide error defense, "[u]nwarranted reliance on a client is not a procedure to avoid error." *McCollough*, 637 F.3d at 948. Stated another way, "the bona fide error defense will not shield a debt collector whose reliance on the creditor's representation is unreasonable[.]" *Clark,* 460 F.3d at 1177.

Here, NBF asserts that when it is assigned an account from a client, its system generates a letter back to the client that requests that the client notify NBF if there are any errors in the information provided. Urbina's reply brief attacks that evidence on many fronts, including that this

exemplar document was not produced to NBF in discovery, and there is no proof that it was sent to Tahoe Fracture Clinic.

Even without the exemplar document, NBF has included as an exhibit to its response the agreement between Tahoe Fracture Clinic and NBF, which states: "Client agrees to assign accounts to Collection Service *with only accurate data* and that the balances reflect legitimate, enforceable obligations of the consumer." (ECF No. 50 at 11, emphasis added.)

This is not a case like *McCollough*, where the debt collector argued reliance on information from the creditor, but there was other information available to the debt collector that would have put it on notice of the error.

Importantly, *McCollough* specifically cites to a Seventh Circuit case that suggested that an agreement with a creditor-client that the client would "only furnish reliable information" would show that a debt collector's reliance on a creditor's representation was reasonable. *McCollough*, 637 F.3d at 949, citing *Turner v. J.V.D.B. & Assocs., Inc.*, 330 F.3d 991, 996 (7th Cir. 2003); *Turner v. J.V.D.B. & Assocs., Inc.*, 318 F.Supp.2d 681, 686 (N.D. Ill. 2004) (on remand from Seventh Circuit, determining that an "understanding and/or agreement" that the client would only furnish reliable information would have been necessary to showing reasonable reliance); *see also Smith v. Transworld Sys., Inc.*, 953 F.2d 1025, 1032 (6th Cir. 1992) (the FDCPA "does not require an independent investigation of the debt referred for collection" where, for example, the debt collector's "referral form, completed and signed by [the creditor-client], include[d] specific instructions to claim only amounts legally due and owing"); *Klemp v. Columbia Collection Service, Inc.*, No. 3:13-cv-1577-PK, 2014 WL 5324318, at * 8 (D. Or. Oct. 17, 2014) (debt collector established it reasonably relied on creditor-client to report the correct balance owed

where contract between debt collector and creditor required creditor to use reasonable diligence so that each account assigned is a valid enforceable account).

Urbina relies on *Reichert v. National Credit Systems*, to support her argument that NBF's reliance on Tahoe Fracture Clinic's information is legally insufficient. Urbina's reliance on language from *Reichert* is taken out of context.

The issue in *Reichert* was that in attempting to collect the debt, the debt collector included a fee the landlord's attorney had charged for writing a letter, but under the lease and consistent with Arizona law, the landlord was not entitled to collect attorney's fees unless in connection with successful litigation. *Reichert v. National Credit Systems, Inc.*, 531 F.3d 1002, 1004 (9th Cir. 2008). On appeal, the debt collector admitted that the attorney's fee was not authorized by the lease or permitted under Arizona law, but argued it was not liable under the bona fide error defense because the landlord-creditor had submitted correct information in the past which entitled it to rely on the landlord's representations in this instance, relying on *Clark*. *Id.* at 1004-06. The debt collector also provided a conclusory affidavit that it had adequate procedures in place to catch the error. *Id.*, 1007.

The Ninth Circuit held that "[t]he fact that the creditor provided accurate information in the past cannot, in and of itself, establish that reliance in the present case was reasonable and act as a substitute for the maintenance of adequate procedures to avoid future mistakes." *Id.* at 1007. The declaration from the debt collector said that the creditor had "never previously given NCS incorrect information." The court pointed out that "[t]he fact that the creditor had not made errors in calculating amounts due does not speak to the problem here, the addition of the attorney's fee." *Id.* The debt collector did not provide any reason that justified it relying on the creditor with respect to adding the attorney's fee (which was not authorized by the lease or authorized by Arizona law).

With respect to procedures maintained to avoid errors, the court confirmed that "the debt collector has an affirmative obligation to maintain procedures designed to avoid discoverable errors, including, but not limited to, errors in calculation and itemization." *Id.* In *Reichert*, this included errors related to a claim for collection expenses not legitimately authorized. *Id.* In that case, the declaration included a conclusory statement that the debt collector maintained procedures; therefore, the Ninth Circuit held that the debt collector failed to establish it was entitled to the bona fide error defense.

Here, the problem at issue was the accuracy of the last date of payment. The agreement between NBF and Tahoe Fracture Clinic provided that Tahoe Fracture Clinic agreed to give NBF accurate data. That procedure does directly speak to the problem at issue. In addition, the agreement is *evidence* of a procedure maintained by NBF to avoid this error, and is not just a conclusory statement in a declaration that procedures are in place.

Moreover, *McCollough* was decided almost three years after *Reichert*, and made specific reference to the Seventh Circuit case for the proposition that where there is an agreement that the creditor-client would only provide reliable information, there is evidence of reasonable reliance on creditor information.

The court finds the agreement demonstrates that NBF had an adequate procedure in place to prevent an error concerning the date of last payment provided by the creditor. Therefore, NBF's reliance on the last date of payment given by Tahoe Fracture Clinic was reasonable, and NBF has proven by a preponderance of the evidence that it is entitled to the bona fide error defense.

///

///

///

# IV. CONCLUSION

Urbina's partial motion for summary judgment (ECF No. 49) is **DENIED**, and summary judgment is **GRANTED** in favor of NBF under Federal Rule of Civil Procedure 56(f) because it has prevailed on the bona fide error defense.

The Clerk shall enter judgment accordingly.

**IT IS SO ORDERED**.

Dated: April 22, 2019.

_____
WILLIAM G. COBB
UNITED STATES MAGISTRATE JUDGE